UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MARIANNE LINCOLN,<br><br>                        Plaintiff,<br>    v.<br><br>STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,<br><br>                        Defendant. | CASE NO. 3:17-cv-05177-RJB<br><br>ORDER ON DEFENDANT STATE FARM AUTOMOBILE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT |

THIS MATTER comes before the Court on Defendant State Farm Automobile Insurance Company's Motion for Summary Judgment. Dkt. 15. The Court has considered the pleadings filed in support of and in opposition to the motion and the file herein.

## I. BACKGROUND

**A. PROCEDURAL HISTORY**

Plaintiff filed this employment action in Pierce County, Washington on October 6, 2016. Dkt. 1-3. Defendant removed the case to this Court on March 10, 2017. Dkt. 1. Defendant has cited diversity jurisdiction as the basis for this Court's subject matter jurisdiction, because Plaintiff resides in the State of Washington, Defendant is incorporated in the State of Illinois, and

Plaintiff has asserted general damages "between $200,000 and $250,000." Dkt. 2 at ¶4; Dkt. 1-13 at ¶¶4.1, 4.2.

The Amended Complaint (Dkt. 1-13), which controls, alleges gender, disability, and age discrimination in violation of the Washington Law Against Discrimination (WLAD). Dkt. 1-13 at ¶¶6.1-6.4. *See* RCW 49.60 *et seq*. The Amended Complaint alleges three WLAD discrimination claims, for Disparate Treatment, Hostile Work Environment, and Unlawful Retaliation. *Id*. at ¶¶6.1-6.3. The Amended Complaint also alleges a common law claim for Wrongful Discharge. *Id*. at ¶6.4.

**B. FACTS**

The Court recites the relevant facts substantiated by the record in the light most favorable to Plaintiff.

*1. Ms. Lincoln's initial employment under Team Manager Matt Dyk.*

State Farm hired Ms. Marianne Lincoln as a Claims Associate, level PA2, in September of 2013. Dkt. 16-1 at 60. As a Claims Associate, Ms. Lincoln processed insurance claims, a task that involved gathering information from policyholders and auto repair shops by phone and making liability determinations up to a certain amount. Dkt. 16-1 at 13-15. Prior to going "live" on December 9, 2013, Dkt. 16-1 at 209, Ms. Lincoln received about two months of training. The training explained various State Farm policies, including the Standard Claim Procedures (SCPs), an internal, written database used by claims associates to handle certain situations in a certain way. Dkt. 16-1 at 8, 9.

Ms. Lincoln began work under Team Manager Carolyn Price. Dkt. 16-1 at 64-67. State Farm transferred Ms. Lincoln to a team managed by Mr. Matt Dyk at some point prior to September 25, 2014. *See* Dkt. 16-1 at 74. In addition to receiving annual reviews, *see, e.g.,* Dkt.

16-1 at 64-72, Ms. Lincoln received work performance feedback from Customer Interaction Reviews ("CIRs"), evaluations from non-team members listening to conversations without notice, Dkt. 16-1 at 11, and from "one-on-one" observation sessions with Team Managers. Dkt. 16-1 at 12. Mr. Dyk's notes from a September 25, 2014 one-on-one session with Ms. Lincoln state: "We talked about AHT [Average Handling Time] and trying to get it down a bit. Talked about sticking to the SCPs [Standard Claim Procedures] and not giving any other advice during the call." Dkt. 16-1 at 74.

Ms. Lincoln asked Mr. Dyk for a promotion from Claims Associate level PA2 to PA3, a promotion that would increase wages but not responsibilities. Dkt. 23 at 2. Mr. Dyk denied the request but told her that she was "within a couple weeks" of the promotion. *Id.* at 2, 3.

*2. Ms. Lincoln's employment under Team Manager Rosa Kong.*

Ms. Lincoln was transferred to a team managed by Ms. Rosa Kong on May 18, 2015. Dkt. 16-1 at 6. Within the first month of Ms. Kong's tenure as team manager, Ms. Lincoln recalls Ms. Kong commenting at a team meeting that older team members "were used to being more 'friendly' on the phone and therefore took longer on calls than younger employees [*sic*] since they had not developed that habit yet," a fact supported by "HR studies conducted." Dkt. 23 at 4. *See also*, Dkt. 21-1 at 4.

Ms. Kong began weekly one-on-one meetings with Ms.Lincoln a couple weeks after the transition, on May 28, 2015. Dkt. 16-1 at 209. Ms. Kong relied upon several metrics to evaluate the performance of her team, including the Standard Claim Procedures; Average Handling Time (AHT), the average the length of calls; and Task Productivity Rate (TPR), the total number of "tasks" accomplished per day. *See*, e.g., Dkt. 23-14. According to Ms. Lincoln, on July 10, 2015, and again on July, 2015, Ms. Kong's one-on-one meetings singled out Ms. Lincoln for technical

violations of the Standard Claim Procedures not also enforced against others. Dkt. 23 at 6. Ms. Kong's notes to the July 10, 2015 session state that Ms. Lincoln "continues to demonstrate remarkable behaviors with every interaction per CIR scores," but "we have discussed quality concerns and the importance of SCP adherence. AHT has improved[.]" Dkt. 16-1 at 99.

On July 20, 2015, another manager emailed Ms. Kong that he had received a complaint by an associate of an "outburst" incident by Ms. Lincoln, where Ms. Lincoln pounded her fist on her desk and loudly stomped her feet. The manager had handled the situation by asking Ms. Lincoln to "be more self-aware and conscientious of those around her." Dkt. 16-1 at 106. On July 21, 2015, Ms. Kong spoke with Ms. Lincoln about the incident, and according to Ms. Kong, Ms. Lincoln acknowledged personal stress, but stated that "personal issues . . . have not affected her quality production and the lack of focus." Dkt. 16-1 at 108.

On July 22, 2015, Ms. Kong sent an email to recap the "conversation of yesterday July 21st, 2015 and to highlight a few sequence of events that have led up to our performance discussion." Dkt. 16-1 at 112. Ms. Lincoln responded to Ms. Kong's email and expressed that receiving Ms. Kong's email "caused me to panic . . . [i]n the light of 2 women over 50 on our team being let go recently . . . [because] I, too am similar in profile (over 50)." *Id*. 110-112. Ms. Kong sympathized that Ms. Lincoln "fe[lt] singled out," but doubled down on her opinion that Ms. Lincoln's was "completely unprofessional and unacceptable." *Id*. at 114. Ms. Kong commented that "[a]s for terminations in the past, it has nothing to do with your allegations and due to private reasons I'm not at liberty to discuss their performance[.]" *Id*. at 114.

On September 24, 2015, Ms. Kong "[c]ompleted file reviews to measure [Ms. Lincoln's] SCP adherence due to her PA3 interest," but "file reviews completed indicated she was not consistently adhering to SCPs." Dkt. 16-1 at 211. Ms. Kong "advised I would continue to

monitor [Ms. Lincoln's] SCP adherence[.]" *Id*. Ms. Kong's notes to a September 25, 2015 one-on-one meeting similarly state, "advised we were going to review her PA3 candidacy." Dkt. 16-1 at 131.

On October 2, 2015, Ms. Kong emailed Ms. Lincoln about a Customer Interaction Review (CIR), where the CIR team had flagged an inappropriate conversation between Ms. Lincoln and a customer. Dkt. 16-1 at 133. According to the CIR, "[d]uring this call, the customer mentioned he would take the [customer satisfaction] survey if this would help with a raise for the associate," and Ms. Lincoln responded to the customer by stating, "I'm kinda hanging on the edge of my seat on that one. They opened up this center two years ago and there's a bunch of us[.]" *Id*. at 135. Ms. Lincoln emailed Ms. Kong at 2:52pm, apologizing for the negative CIR and conveying that she was "not in a good place to discuss [the CIR] at this time" because she felt overwhelmed. Dkt. 16-1 at 139. Ms. Lincoln reported "trying to keep [herself[ together . . . to get [her] affairs in order regarding logics for the surgery." *Id*. A 3:36pm email from another manager to Ms. Kong reported Ms. Lincoln venting frustration about the negative CIR and meager prospects of a PA3 promotion, because, "who would promote someone who's about to go on medical leave." *Id*. at 141. Ms. Lincoln first notified Ms. Kong of her need for medical leave on October 2, 2015. Dkt. 23 at 9; Dkt. 21-2 at 33.

While out on leave, which began on October 6, 2015, on October 20, 2015, Ms. Lincoln called Ms. Holly Williams (HR). Ms. Williams' notes reflect that Ms. Lincoln expressed her frustrations with Ms. Kong and requested a new manager. Dkt. 16-1 at 148. According to Ms. Williams' notes, she discussed with Ms. Lincoln State Farm's "expectation that she is to work for any manager." *Id*. The conversation also included discussion of Plaintiff's medical leave, and

Ms. Williams "discussed ADA and if [Ms. Lincoln] needed anything to let Rosa [Kong] know when she returns[.]" *Id*.

Ms. Lincoln returned to work from leave on November 16, 2015. Dkt. 23 at 9, 10. On December 9, 2015, Ms. Kong drafted a work performance memo about Ms. Lincoln, referred the parties as a "drop file memo." Dkt. 16-1 at 154-155. The drop file memo outlined a series of work performance concerns by Ms. Kong. *Id*. Ms. Kong signed the memo, but Ms. Lincoln refused to sign. *See id*. Cynthia Jones, HR, and "Supervisor Drop File" were copied in the correspondence. *Id*. Ms. Lincoln comprehensively responded to the drop file memo by email on December 17, 2015. Dkt. 16-1 at 164-167. Around that time, on December 6, 2015, Ms. Kong also informed Ms. Lincoln that she was no longer authorized to take overtime shifts. Dkt. 23 at 10, 11.

On December 17, 2015, Ms. Kong reprimanded Ms. Lincoln for typing on her personal laptop. Ms. Kong recalls that Ms. Lincoln responded by raising her voice and saying, "Go away and leave me alone! Do you want me to finish the training or not?" Dkt. 16-1 at 214. Ms. Kong "[c]onsulted with leadership and Human Resources who made the decision to place [Ms. Lincoln] on Paid Administrative Leave." Dkt. 16-1 at 214.

Ms. Lincoln was placed on paid administrative leave from December 17, 2015 until January 6, 2016. Dkt. 23 at 14, 15. At a January 13, 2016 one-on-one meeting, Ms. Kong reprimanded Ms. Lincoln for "cherry picking" tasks to improve the appearance of her speed, though in Ms. Lincoln's view, she was exercising discretion to economize her tasks. *Id*. Ms. Kong sent an email on January 13, 2016 recapping her view that Ms. Lincoln had made no progress in improving her adherence to the SCPs. Dkt. 16-1 at 205-206. Ms. Lincoln responded to the email by rejecting Ms. Kong's accusations. Dkt. 16-1 at 206.

*3. State Farm's termination of Ms. Lincoln's employment.*

On January 20, 2016, Ms. Kong by email recommended terminating Ms. Lincoln to "upper leadership," comprised of Ms. Jones (HR), Don Bright, and Javier Ray. Dkt. 21-2 at 33. According to Ms. Kong, her recommendation was based "strictly on performance," as well as misconduct, *to wit*, Ms. Lincoln's disruptive and insubordinate behavior. Dkt. 21-2 at 38, 41. In Ms. Kong's view, three incidents supported the misconduct conclusion: (1) the outburst incident, (2) the personal laptop incident, and (3) the cherry pick incident. Dkt. 21-2 at 38.

Ms. Kong's January 20, 2016 email recommended immediate employment termination for "Misconduct." Dkt. 16-1 at 218. The email states:

> [Ms. Lincoln] has not shown a consistent ability to accept feedback, implement the feedback, and maintain professionalism in the work environment. [Ms. Lincoln] has been provided multiple coaching opportunities, feedback, and job shadows to help her consistently achieve expectations. She has disregarded and chosen not to implement specific job performance related feedback with regards to her customer interactions and adherence to the Standard Claim Processes (SCPs). This has resulted in instances of insubordination on the work floor which was overheard by and disruptive to the team[.]

Dkt. 16-1 at 218. The email also narrated a summary of "recent events," from December 9, 2015 until December 12, 2015, including a December 12, 2015, incident where Ms. Kong "[c]onducted weekly side by side observation . . . [and] observed [Ms. Lincoln] filtering through task work and cherry picking easier tasks." *Id*. at 219. According to Ms. Kong, Ms. Lincoln "stated that she disagreed" with that policy and refused to comply, by continuing to filter through task work, completing easier tasks first. *Id*.

At a meeting on January 22, 2016, attended by Ms. Lincoln, Ms. Kong, Ms. Williams (HR), and another manager, Ms. Kong informed Ms. Lincoln of her termination because performance had fallen below expectations, where "most recently in a [one-on-one] she refused to cease cherry picking and follow the SCPs [Standard Claims Procedure]." Dkt. 16-1 at 222.

Ms. Lincoln remarked at the meeting that she was "leaving under a lie" and denied cherry picking. *Id.*

### 4. *Ms. Lincoln's discrimination complaints*

On October 14, 2015, Ms. Lincoln filed an EEOC age discrimination complaint with the Washington State Human Rights Commission. Dkt. 16-1 at 145-146. The EEOC claim represents that Ms. Lincoln, age 58, was denied a promotion and raise because of age discrimination. *Id.* According to the EEOC complaint, "a major change was made in the way that we process claims and . . . my Team Leader kept moving the target and telling me that I still could not get a promotion and a raise. . . find[ing] fault with my performance in subject areas." *Id.* Five employees in the "Protected Age Group have been let go, while three employees under the age of 30 have received promotions and/or raises." *Id.*

On January 14, 2016, Ms. Lincoln filed a second EEOC complaint, alleging age and gender discrimination. Dkt. 21-2 at 34.

In addition to the EEOC complaints, Ms. Lincoln filed an internal State Farm complaint with the State Farm Compliance and Ethics Hotline. A State Farm Case Detail Report narrates Ms. Lincoln's concern, raised on December 17, 2015, as follows:

> Caller states caller is reporting retaliation. Caller states caller 58 years old, and caller is on a team of about 12 people. Caller states four people have been eliminated from this team, and they are all over the age of 50. Caller states when caller announced . . . back surgery, Rosa Kong changed how Rosa approached caller, and Rosa started attacking caller's performance . . . Caller is afraid of fired . . . needs overtime pay to pay medical bills.

Dkt. 16-1 at 169. The follow-up comment to the Case Detail Report, dated December 18, 2015, states, "As the investigation is completed, we will provide an update to this site indicating the status of the investigation. *Id.* at 171. A second follow-up comment, dated December 29, 2015, states, "Caller is calling for a management response. Specialist reads caller the management

response. Caller states there is more going on . . . Caller states caller is on leave. Caller thanks specialists, leaves no further comments, and ends call." *Id*.

On December 22, 2015, Evelynn Hurdman, Employee Relations Investigator, interviewed Ms. Lincoln about "some concerns recently brought forward." Dkt. 16-1 at 176. Ms. Hurdman also interviewed Mr. Dyk and another manager. Dkt. 16-1 at 185-190, 194. Ms. Hurdman did not interview Ms. Kong, because, in her view, the allegations of discrimination and retaliation against Ms. Lincoln were "not substantiated [] [a]s the evidence provided to [*sic*] do not indicate behavior . . . rose to the level of a policy violation she was not interviewed." *Id*. at 194.

   5. *Termination of employment for other members of Ms. Kong's team.*

Including Ms. Lincoln, Ms. Kong's team had twelve people, eight of whom were over age fifty (50), including Ms. Lincoln. 21-1 at 29; Dkt. 22 at ¶3; Dkt. 23 at 3. The other four people were under age thirty (30). *Id*. Three of those four had previously received level PA3 promotions, and the fourth was promoted under Ms. Kong's management. *Id*.

Between June of 2015 and January of 2016, State Farm terminated six Claims Associates from Ms. Kong's team, all of whom were over the age of fifty (50): Lori Chavez (June 2015), Mary Huff (July 2015), Rene Sherry (August 2015), Kristine Morley (September 2015), Ms. Lincoln (January 2016), and Jim Shea (January 2016). Dkt. 21-2 at 38, 39; Dkt. 23 at 5. State Farm terminated them ostensibly because none of them showed "any immediate or sustained improvement." *Id*. State Farm also terminated Susan Hamilton, age 61, in May 2015, during the manager transition from Mr. Dyk to Ms. Kong. Dkt. 23 at 5.

In the opinion of Katheryn Vazquez, a member of Ms. Kong's team who "did not want to draw the conclusion that someone was singling out people over 40[,]" employees over age forty

ORDER ON DEFENDANT STATE FARM AUTOMOBILE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT - 9

(40) "appeared to be coached differently[.]" Dkt. 21-1 at 4, 9. The younger employees were "held up as examples to us in areas where we struggled." *Id*. Mr. Shea, age sixty, who was terminated approximately one week after Ms. Lincoln, testified that Ms. Kong "had a strong dislike of being challenged. I believe that the older people on our team . . . challenged her . . . [and] she didn't' like that." Dkt. 21-1 at 21. According to Ms. Shea, "[n]ewly trained employees were brought in as replacements, with only one being over 40." Dkt. 22 at ¶6. *See also*, Dkt. 21-2 at 24.

## II. <u>DISCUSSION</u>

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

## B. WLAD CLAIMS GENERALLY

The WLAD prohibits discrimination based on sex[1], physical disability, and age, *inter alia*. RCW 49.60.010. At summary judgment, where, as here, the plaintiff does not make a showing of direct discrimination[2], courts apply the three-part *McDonnell Douglas* burden-shifting framework. *Scrivner v. Clark College*, 181 Wn. 2d 439, 445 (2014). First, the plaintiff-employee must make a prima facie showing of discrimination. If the plaintiff-employee makes a sufficient showing, second, the defendant-employer must show a legitimate, non-discriminatory reason for its adverse employment action. If the defendant-employer makes a sufficient showing, thirdly, the plaintiff-employee must show that the defendant-employer's reason was pretext.

To show pretext, "[a]n employee does not need to disprove each of the employer's reasons[.]" *Scrivener*, 181 Wn. 2d at 447. Instead, the plaintiff may satisfy the pretext prong by

---

[1] The Amended Complaint alleges gender discrimination. The WLAD defines "sex" as "gender." RCW 49.60.040(25).

[2] The only reference to direct discrimination appears to be a cut and paste job. *See* Dkt. 20 at 16, 17.

ORDER ON DEFENDANT STATE FARM AUTOMOBILE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT - 11

showing that the defendant's articulated reason had no basis in fact, was not really a motivating factor, was not temporally connected to the adverse employment action, or was not a motivating factor in the employment decision for other employees in the same circumstances. *Id*. at 447-48 (2014). The plaintiff may also satisfy the pretext prong by showing that discrimination was a substantial motivating factor. "Substantial factor" refers to a significant motivating factor, not necessarily the sole or main one. *Id.* at 444; Washington Pattern Jury Instructions, 330.01.01 (6th ed. 2012). "When the record contains reasonable but competing inferences of both discrimination and nondiscrimination, the trier of fact must determine the true motivation." *Id*. at 445, summarizing *Rice v. Offshore Systems, Inc.*, 167 Wn. App. 77 (2012).

## C. DISPARATE TREATMENT

*1. Prima facie case.*

"Disparate treatment occurs when an employer treats some people less favorably than others because of . . . [a] protected status." *Alonso v. Qwest Communications Co., LLC*, 178 Wn. App. 734, 743 (2013). The prima facie disparate treatment claim for discrimination has four elements: (1) that the employee-plaintiff belongs to a protected class, (2) was subject to an adverse employment action, (3) was doing satisfactory work, and (4) the employer-defendant replaced the plaintiff-employee with a person not of that protected class, or sought applicants with similar qualifications to the employee-plaintiff. *Mikkelsen v. PUD No. 1 of Kittitas Cty.*, 189 Wn. 2d 516, 527 (2017) (age and gender). *See also*, *Riehl v. Foodmaker, Inc.*, 152 Wn. 2d 138, 149 (2004)(disability[3]).

---

[3] *Mikkelson* clarified the fourth element, known as the "replacement element," for discrimination cases generally. It arguably overrules *Riehl* in part as to the fourth element.

ORDER ON DEFENDANT STATE FARM AUTOMOBILE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT - 12

The first element is satisfied where it undisputed that Ms. Lincoln is a member of classes protected by the WLAD, as a female, age 58, with ongoing medical issues. Also for purposes of this motion, Defendant does not dispute the second element, "adverse employment action," because State Farm terminated Ms. Lincoln's employment. Dkt. 24 at 11. *See also*, *Kirby v. City of Tacoma*, 124 Wn.App. 454, 465 (2004). Defendant challenges Plaintiff's showing as to the third and fourth elements. The third element, satisfactory work, is satisfied by viewing performance metrics in a light favorable to Plaintiff. Although Ms. Kong repeatedly pointed to problems with Ms. Lincoln's performance, Ms. Lincoln at times out-performed colleagues on metrics such as Average Handle Time and Task Productivity Rate. *See, e.g.,* Dkt. 23-14.

The fourth element examines whether State Farm replaced Ms. Lincoln with a person outside of her protected classes (female, over age forty, with ongoing medical issues), or at least sought applicants with qualifications similar to Ms. Lincoln. *Mikkelsen*, 189 Wn. 2d at 527. *See Grimwood*, 110 Wn.2d 355, 362 (1988). According to Mr. Shea, age sixty, at the time of his termination on January 29, 2016, "5 other women over 40 had already been terminated from the team [and] [n]ewly trained employees were brought in as replacements, with only one being over 40." Dkt. 22 at ¶6. *See also*, Dkt. 21-2 at 24. Mr. Shea's declaration is sufficient for purposes of the claim for disparate treatment based on age.

However, Plaintiff has not pointed to—and the Court is aware of no evidentiary showing for—a similar showing for the fourth element for sex and disability discrimination. *See* Dkt. 20 at 18-21. A showing for the fourth element would consider, e.g., whether State Farm replaced Ms. Lincoln with male employees and employees without ongoing medical issues, or whether State Farm solicited applications from persons of similar background and qualification to Ms.

Lincoln. Because Plaintiff has not made a showing as to the fourth element, Defendant's motion should be granted in part as to the claim for disparate treatment based on sex and disability.

   *2. Legitimate, non-discriminatory reason for employment termination.*

The Court next considers Defendant's showing of a legitimate, non-discriminatory reason for State Farm's termination of Ms. Lincoln's employment. State Farm ostensibly terminated Ms. Lincoln on two grounds, performance and misconduct. Perhaps the most distilled summary of the basis for termination is Ms. Kong's December 9, 2015 drop memo, which articulated a series of performance problems, and Ms. Kong's January 20, 2016 email, which recommended termination for misconduct. Dkt. 16-1 at 154, 218. Defendant has met its burden.

   *3. Pretext.*

Finally, the Court turns to the showing of pretext, a burden Plaintiff has met. Over the course of about six months, on Ms. Kong's team of twelve people, State Farm terminated six people, including Ms. Lincoln, over the age of fifty. Dkt. 21-1 at 29; Dkt. 22 at ¶3; Dkt. 23 at 3. At a team meeting less than one month into Ms. Kong's tenure, Ms. Kong commented that older team members were used to being friendlier on the phone and took longer than younger employees. Dkt. 23 at 4. *See* Dkt. 21-1 at 4; Dkt. 21-1 at 30; 21-2 at 4, 28. Ms. Kong coached older employees differently than younger ones, and presented the work of younger employees as exemplary to older ones. Dkt. 21-1 at 4, 9; Dkt. 21-2 at 6. State Farm gave younger employees more opportunities for mentorship and promotion, Dkt. 21-2 at 17, 18, 24; Dkt. 23-3 at 3, and increased wages of four members of Ms. Kong's team under the age of thirty. Dkt. 22 at ¶3; Dkt. 23 at 3. Viewing these facts together in the light favorable to Plaintiff at a minimum reasonably points to competing inferences of age discrimination and nondiscrimination. Notwithstanding Defendant's argument that all of the terminated team members also had glaring work

performance issues, Dkt. 24 at FN10, Plaintiff has met her burden to show pretext, because a reasonable trier of fact could find that age was a substantial factor motivating the termination of Ms. Lincoln's employment.

Defendant's motion should be granted in part and the claim dismissed as to disparate treatment based on sex and disability, because Plaintiff has not met her prima facie burden. Defendant's motion should otherwise be denied. The claim for disparate treatment based on age may proceed.

### D. UNLAWFUL RETALIATION

The prima facie case of unlawful retaliation requires a showing that (1) the employee-plaintiff engaged in a statutorily protected activity, (2) the employee-plaintiff suffered an adverse employment action, and (3) there is a causal link between the activity and the adverse action. *Marin v. King County*, 194 Wn. App. 795, 811 (2016). *See also*, *Short v. Battle Ground School Dist.*, 169 Wn. App. 188 (2012), *overruled in part on other grounds*. To prove a causal link, the plaintiff must provide evidence that the protected activity was a substantial factor motivating the adverse action. *Currier v. Northland Services, Inc.*, 182 Wn. App. 733, 746 (2014). "Thus, retaliation need not be the main reason . . . but instead only be the reason that 'tips the scales'" towards the adverse action. *Id*.

For purposes of Plaintiff's prima facie burden, the first element of protected activity is satisfied, given that Plaintiff filed three discrimination complaints. *See, e.g., Estevez v. Faculty Club of the Univ. of Wash.*, 129 Wn. App. 774, 778 (2005). Defendant appears to concede this element. *See* Dkt. 15 at 24 (Defendant "does not deny that Ms. Lincoln complained of discrimination several times"). The second element is also satisfied, because as discussed above, there is no dispute that terminating employment is an adverse employment action.

Considering the third element, causation, Plaintiff has not met her burden. Plaintiff's Response does not parse out specific facts for each element. Dkt. 20 at 22. The Response argues generically that there is "more than ample evidence" of retaliation, pointing to just three facts: (1) State Farm failed to interview Ms. Lincoln when conducting its internal investigation of her age discrimination complaint; (2) Ms. Jones (HR) knew of Ms. Lincoln's complaints, yet has denied knowledge of them, which is "suspicious"; and (3) Ms. Kong "increased the negative reviews, 'tubed' plaintiff's attempts to promote or transfer. . . [and] ignored her discrimination complaints . . . to set [Ms. Lincoln] up for bad performance and termination." *Id*.

The first two facts, even if true, do not point to retaliation *because of* Ms. Lincoln filing the EEOC and State Farm complaints. First, the fact that State Farm deliberately declined to interview Ms. Lincoln when conducting its internal investigation does not tend to show an intent to terminate Ms. Lincoln, but rather, at most, shows that State Farm protected its management and believed management over others. Second, if Ms. Jones knew of Ms. Lincoln's discrimination complaints, it does not follow that Ms. Lincoln was terminated because she filed them. The decision to terminate Ms. Lincoln was made by a team of three people, including Ms. Jones, and there is no evidence that the two others knew of the complaints. In any event, mere awareness is not enough of a showing for causation.

The third fact offered by Plaintiff focuses on Ms. Kong's denial of (1) promotion and (2) transfer and (3) negative reviews. This fact could potentially show causation of unlawful retaliation, but only if this negative treatment *increased* after Ms. Lincoln filed her EEOC and State Farm complaints. The record does not support this theory. (1) Ms. Lincoln was denied promotion to PA3 by both Mr. Dyk and by Ms. Kong prior to the filing of the EEOC complaint in October of 2015. Dkt. 16-1 at 211; Dkt. 23 at 2. (2) Ms. Lincoln requested to be transferred to

another supervisor, but Ms. Williams (HR) reiterated State Farm policy that employees were expected to perform under any supervisor, Dkt. 16-1 at 148, and nothing in the record indicates any basis to conclude that this policy was not consistently enforced. (3) Ms. Kong began meeting with Ms. Lincoln for weekly one-on-one performance-related meetings, presumably the source of what Plaintiff refers to as "negative reviews," on May 28, 2015, approximately two weeks into Ms. Kong's tenure as a manager. Dkt. 16-1 at 209. The meetings continued until Ms. Lincoln's termination in January of 2016. *Id*. Negative reviews (Plaintiff), also known as constructive criticisms, are apparent throughout the content of Ms. Kong's reviews in every meeting, long before Ms. Lincoln filed any discrimination complaints. *See, e.g.,* Dkt. 16-1 at 99; Dkt. 23 at 6.

Plaintiff has not met her prima facie burden to show a causal nexus between the filing of her discrimination complaints and the termination of her employment. Even if she could, this claim would not survive summary judgment because of the insufficient showing of pretense. Returning again to the three facts alleged in Plaintiff's Response, *see* Dkt. 20 at 22, does not make a pretense showing. Nor does examination of the record point to pretext. The most that Plaintiff could point to is that Ms. Kong and Ms. Jones knew of Ms. Lincoln's complaints and were involved in the recommendation (Ms. Kong) and decision (Ms. Jones) to terminate employment. Beyond the mere timing of events, e.g., the fact that Ms. Lincoln's termination followed the filing of her complaints, no other facts support the theory that Ms. Lincoln's complaints were a motivating factor to Ms. Kong, Ms. Jones, or anyone else involved in the termination decision.

As to the unlawful retaliation claim, Plaintiff has not met her prima facie burden and has made no showing of pretense. Defendant's motion should be granted and the claim dismissed.

### E. WRONGFUL DISCHARGE

Although Defendant has requested summary judgment of dismissal for all claims, Defendant's briefing does not directly discuss the wrongful discharge claim. *See* Dkt. 1-13 at ¶6.4; Dkt. 15 at 20:8-13, 22:16-20, 23:13-16, 24:1-4; Dkt. 24. Wrongful discharge or termination is a distinct and discrete type of claim from a claim for unlawful retaliation. *See, e.g,. Blinka v. Wash. State Bar Ass'n*, 109 Wn. App. 575 (2001). Whether this omission was strategic or an oversight, Defendant has not met its burden to show summary judgment of dismissal. Defendant's motion should therefore be denied as to this claim.

### F. HOSTILE WORK ENVIRONMENT

To establish a hostile work environment claim, a plaintiff must prove that harassment to the plaintiff (1) was unwelcome, (2) was because the plaintiff is a member of a protected class, (3) affected the terms and conditions of the plaintiff's employment, and (4) was imputable to the employer. *Domingo v. Boeing*, 124 Wn. App. 71, 84 (2004). Conduct affects the conditions of employment "if it is sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Glasgow v. Georgia-Pacific Corp.*, 103 Wn. 2d 401, 406 (1985). "Casual, isolated or trivial manifestations of a discriminatory environment" are legally insufficient. *Id*. Courts look to the totality of the circumstances, such as: "the frequency and severity of the discriminatory conduct; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interference with an employee's work performance." *Washington v. Boeing Co.*, 105 Wn. App. 1, 10 (2000).

Applied here, Plaintiff has failed to show that State Farm's harassment affected the terms and conditions of her employment, the third element. Plaintiff's showing is overwhelmingly conclusory, where, after articulating the relevant law, Plaintiff first argues that "[i]n this case,

there is substantial evidence . . . that the plaintiff was the victim of a hostile work environment due to her age and disability." Dkt. 20 at 23.

Plaintiff next notes that, "[i]n a rather compressed period of time [Plaintiff] . . . was subject to a wide variety of investigative actions and complaints which . . . surrounded the manifestations of her age and/or disability within the work environment." Dkt. 20 at 24. Plaintiff does not specify the frequency or source of these investigative actions and complaints. From further context in the briefing, it appears that Plaintiff may be referring to the high "volume and intensity of actions taken against plaintiff following her back surgery," where Ms. Kong "paid extra attention to plaintiff, often marched to [Ms. Lincoln's] desk to criticize her and . . . to try to write up anything you do that she disagrees with[.]" *Id*. If so, Plaintiff's theory is, in essence, that Ms. Kong's one-on-one reviews and intermittent "write ups" constituted age and disability harassment that in their totality created a hostile work environment. However, Ms. Kong's one-on-one reviews occurred consistently approximately once per week. Ms. Kong's write ups, such as the December 9, 2015 drop memo, occurred only a handful of times over a period of several months. Even if the reviews and write ups are construed as age and disability harassment, it cannot be said that such "harassment" was pervasive, given this infrequency.

Nor can it be said that Ms. Kong's one-on-one reviews and write ups were "severe," because their content plainly related to work performance, not Ms. Lincoln's protected class, and none made plain insults or threats to Plaintiff's physical well-being. In their totality, the reviews and write ups do not amount to a discriminatory environment. No trier of fact could find that Defendant's conduct constituted severe or pervasive harassment.

Plaintiff has not met her burden to show an issue of material fact as to whether age or disability discrimination was sufficiently severe and pervasive to affect the terms of

ORDER ON DEFENDANT STATE FARM AUTOMOBILE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT - 19

employment. Defendant's motion should be granted as to the hostile work environment claim, which should be dismissed.

* * *

Therefore, it is HEREBY ORDERED that Defendant State Farm Automobile Insurance Company's Motion for Summary Judgment (Dkt. 15) is GRANTED IN PART and DENIED IN PART as follows:

1. <u>Disparate treatment claim</u>: The motion is granted in part as to a disparate treatment claim based on sex discrimination and disability discrimination. To that extent, the claim is dismissed. The motion is otherwise denied. The claim for disparate treatment based on age discrimination may proceed.

2. <u>Unlawful retaliation claim</u>: The motion is granted. This claim is DISMISSED.

3. <u>Wrongful discharge</u> claim: The motion is denied.

4. <u>Hostile work environment</u>: The motion is granted. This claim is DISMISSED.

IT IS SO ORDERED.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 12th day of February, 2018.

*[signature: Robert J. Bryan]*

ROBERT J. BRYAN
United States District Judge